## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **Adrian Pavel and Teodora Pavel,** | ) | **Case No. 23-60444-btf7** |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| **Alannah Walton,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adv. No. 23-6011** |
| | ) | |
| **Adrian Pavel,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Alannah Walton (1) seeks a money judgment against Debtor-Defendant Adrian Pavel, alleging he violated the Missouri Merchandising Practices Act (MMPA) and (2) asks the court to determine that her MMPA claim against Pavel's chapter 7 estate is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

In early 2023, Walton paid $12,000 to purchase a 2012 BMW 550i from Pavel. Walton alleges Pavel made multiple misrepresentations regarding the condition of the car before the sale and defrauded her under the MMPA. Walton seeks a judgment against Pavel for the $12,000 purchase price of the car, $500 in accrued interest on the amount she borrowed to purchase the car, and $12,146.81 in attorney's fees. Pavel denies Walton's allegations and argues she is not entitled to the relief she requests.

The court concludes that Walton is entitled to damages under the MMPA, and her claim against Pavel is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

## BACKGROUND

This dispute arises from Walton's purchase of a used car from Pavel. Walton was searching for a new vehicle when in January of 2023, she saw Pavel's Facebook advertisement for a 2012 BMW 550i.[1] She messaged him via Facebook and asked whether the car was still available and whether the car "need[ed] anything."[2] In response, Pavel told Walton that the check engine light was on, and that he had the BMW Dealership of Springfield replace a crankshaft position sensor.[3] Pavel further stated that after the check engine light remained on, he returned the car to the dealership, but the dealership could not find anything wrong with the car.[4] In reply, Walton asked whether the car showed any signs of problems. Pavel assured her that the car had "no issues."[5] Walton informed Pavel that she would work with her bank to arrange financing for the purchase of the car, and Walton and Pavel scheduled a time for Walton to see the car.[6]

Soon after, Walton test drove the car. She confirmed that the car's check engine light was on, but she testified that she experienced no issues when driving the car—explaining that she thought the car's idling sounded normal, the car accelerated and

---

[1] April 18 Trial Tr. 3:19–25, 4:7–8, ECF No. 28. Unless otherwise noted, all citations of ECF filings refer to filings in the *Walton v. Pavel* adversary proceeding, Adv. No. 23-6011.

[2] *Id.* at 4:9–14, 5:9–13.

[3] Alannah Walton's Exs. for Trial, ECF No. 22, Ex. 2, pg. 1 of 11; April 18 Trial Tr. 5:18–21, 17:6–11, 27:16–23, 28:7–9.

[4] Alannah Walton's Exs. for Trial, ECF No. 22, Ex. 2, pg. 1 of 11.

[5] *Id.* at pg. 2 of 11.

[6] *Id.* at pg. 4–5 of 11.

braked correctly, and that everything appeared to work like it should.[7] After the test drive, Walton moved forward with purchasing the car from Pavel.[8] Walton obtained a $12,000 loan from her husband's 401(k) account to pay for the car.[9] Walton and Pavel subsequently arranged a meeting to complete the sale, and Walton asked Pavel to bring the title and any service records to the meeting as a condition to the sale.[10] She met with Pavel a few days later, and he provided the car's title, a bill of sale, and a service record from the dealership that Walton later discovered was deceptively incomplete.[11]

The incomplete service record indicated that the dealership inspected the car, installed the new crankshaft position sensor, and found no other issues, except that the check engine light was still illuminated.[12]

On January 20, 2023, Walton purchased the car and signed the "as-is no warranty Bill of Sale."[13]

Walton testified that she experienced no issues with the car after she purchased it, but she nevertheless took the car to someone who specializes in German-made vehicles for preventative maintenance.[14] To Walton's surprise and dismay, the specialist discovered the car had faulty timing chains. The specialist warned Walton that the faulty timing chains could cause the car to shut down at any

---

[7] April 18 Trial Tr. 7:1–4.
[8] *Id.* at 7:5–12, 12:2–5, 14:2–5.
[9] *Id.* at 9:7–24.
[10] Alannah Walton's Exs. for Trial, ECF no. 22, Ex. 2, pg. 6 of 11.
[11] *Id.* at Ex. 3; April 18 Trial Tr. 11:19–25, 12:1–3, 14:12–14, 16:1–3.
[12] Alannah Walton's Exs. for Trial, ECF no. 22, Ex. 3.
[13] April 18 Trial Tr. 10:18–22; Alannah Walton's Exs. for Trial, ECF No. 22, Ex. 6.
[14] April 18 Trial Tr. 11:8–18.

time if she did not replace the timing chains or the entire engine.[15] Walton testified that the cost to replace the engine would exceed $20,000.[16]

Because the repairs would be so costly, Walton decided against replacing the engine. She then obtained complete service records directly from the BMW dealership, which revealed that when Pavel returned the car to the dealership after getting the crankshaft position sensor repaired, the dealership informed Pavel that the timing chains on the car were faulty and quoted him $19,709.23 to make repairs.[17]

Pavel, however, says he declined the repairs after the dealership informed him that his extended service plan would not cover the cost because the price of the repairs exceeded the value of the car.[18] Instead, Pavel claims he took the car to his father-in-law's friend, a retired mechanic.[19] Pavel—relying on hearsay—claims that the retired mechanic told him that the timing chains were not faulty and that the car's persistent issues resulted from the crankshaft position sensor not being installed correctly.[20] Pavel claims that after the retired mechanic fixed the issue he identified by replacing a gasket, Pavel operated the car without any trouble. Pavel soon began trying to sell the car on Facebook.

After Walton saw the complete service record including the faulty timing chains diagnosis, she concluded Pavel deliberately misled her to believe the car had no issues, and she requested that Pavel rescind the sale.[21] Pavel refused and

---

[15] *Id.* at 13:5.
[16] *Id.* at 3:5–7.
[17] *Id.* at 17:24–25; Alannah Walton's Exs. for Trial, ECF No. 22, Ex. 5.
[18] April 18 Trial Tr. 29:10–22.
[19] *Id.* at 29:22–25.
[20] *Id.* at 30:1–13.
[21] *Id.* at 18:23–25.

responded that he had never had any other issues with the car besides the crankshaft position sensor, and that he was not responsible for anything that happened after the sale.[22]

Walton then sued Pavel in state court, alleging he violated the MMPA and seeking damages and recission of the sale.[23] After Walton filed the state court lawsuit, Pavel and his wife filed their chapter 7 bankruptcy petition.[24] Walton filed a proof of claim for $12,000 against Pavel[25] and brought this adversary proceeding against Pavel seeking damages and a determination that her claim is nondischargeable under 11 U.S.C. § 523(a)(2)(A) as a debt for money obtained by "false pretenses, a false representation, or actual fraud."

This court held a trial on April 18, 2024, during which it admitted evidence and took testimony from Walton, and both sides presented argument. Having explained the relevant background information, the court turns to the merits of the present dispute.

## JURISDICTION

The court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334 and 157(a). With respect to Walton's MMPA claim, the parties have consented to the court's jurisdiction, and Walton's nondischargeability count is statutorily core under 28 U.S.C. § 157(b)(2)(I) and constitutionally core. The court, therefore, has authority to hear this case and make a final determination.

---

[22] *Id.* at 19:1–5.
[23] Complaint by Alannah Walton, ECF No. 1, Ex. B.
[24] Adrian Pavel and Teodora Pavel's Chapter 7 Bankruptcy Case, Case No. 23-60444.
[25] Proof of Claim of Alannah Walton, Claim 1-1.

## ANALYSIS

### I. Missouri Merchandising Practices Act

The court must first determine the merits of Walton's MMPA claim. The MMPA, Mo. Rev. Stat. § 407.010 *et seq.*, is a consumer protection statute, *Kelly v. Cape Cod Potato Chip Co., Inc.*, 81 F. Supp. 3d 754, 759 (W.D. Mo. 2015), that "supplement[s] the definition of common law fraud," and "attempts to preserve fundamental honesty, fair play[,] and right dealings in public transactions." *Mattingly v. Medtronic, Inc.*, 466 F. Supp. 2d 1170, 1173 (E.D. Mo. 2006).

Walton brings her MMPA claim under § 407.025. To succeed on her claim, she must prove four elements under § 407.025.1(1), and another three under § 407.025.1(2),[26] by the preponderance of the evidence. *See Fielder v. Credit Acceptance Corp.*, 19 F. Supp. 2d 966, 978 (W.D. Mo. 1998) (applying preponderance of the evidence standard to MMPA cause of action tried by jury).

#### A. Section 407.025.1(1) Elements

The court will first analyze the elements under § 407.025.1(1).

Under § 407.025.1(1), to successfully bring an MMPA claim, the plaintiff must prove that she (1) "purchased merchandise from [the defendant]" (2) for "personal, family or household purposes" and (3) "as a result of an act declared unlawful under the MMPA," (4) she "suffered an ascertainable loss of money or property." *Tucker v.*

---

[26] In 2020, the Missouri state legislature amended the MMPA, creating additional requirements for plaintiffs seeking damages under the MMPA. *Diesel v. Mariani Packing Co., Inc.*, Case No. 4:22-CV-01368-AGF, 2024 WL 1674520 at *5 (E.D. Mo. Apr. 18, 2024) (discussing 2020 amendments).

*Gen. Motors LLC*, 58 F.4th 392, 397 (8th Cir. 2023) (cleaned up).  The court will first

discuss whether Walton purchased merchandise.

### 1. Purchased Merchandise

It is clear from the evidence presented that Walton purchased the vehicle for

$12,000 from Pavel. Walton also established and the parties appear to agree that the

car she purchased is merchandise under the MMPA's broad definition that includes

any "objects, wares, goods, commodities, intangibles, real estate or services." Mo. Rev.

Stat. § 407.010.(4).

### 2. For Household Purposes

Likewise, Walton has proven and the parties appear to agree that Walton

purchased the car for household purposes. Walton testified and further explained

that she purchased the car to replace a totaled vehicle, and that she and her husband

planned to pay for the car in cash to lower their monthly expenses.[27]

### 3. Unlawful Act under § 407.020

Pavel committed an unlawful act under § 407.020 by making

misrepresentations and concealing or omitting material facts.

Section 407.020 proscribes the "use or employment by any person of any

deception, fraud, false pretense, false promise, misrepresentation, unfair practice or

the concealment, suppression, or omission of any material fact in connection with the

sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.1. Although

---

[27] April 18 Trial Tr. 3:24–25; 4:1.

§ 407.020.1 enumerates several unlawful acts including "any form of deception," the court will focus on misrepresentation and concealment or omission of material facts.

### a. Misrepresentation

Pavel made several misrepresentations to Walton regarding the condition of the car.

Although the MMPA does not define "misrepresentation," federal courts apply the Missouri rules of statutory construction codified in the Missouri Code of State Regulations. *See Tucker v. Gen. Motors LLC*, 58 F.4th at 397 (applying Missouri Code of State Regulations definitions in MMPA case). The Missouri regulations define "misrepresentation" as any "assertion that is not in accord with the facts." Mo. Code Regs. Ann. tit. 15, § 60-9.070. An assertion can be "words, conduct or pictorial depiction, and may convey past or present fact, law, value, opinion, intention or other state of mind." Mo. Code Regs. Ann. tit. 15, § 60-9.010(1)(A).

Here, Pavel made several assertions that were not in accord with past or present facts. Pavel told Walton that the car did not need any repairs, despite knowing about the faulty timing chains. He even emphasized his assertion that the car did not need any repairs by telling Walton he drove the car daily to work without any issues. He also told Walton that he took the car to the dealership after having the crankshaft position sensor installed and that the dealership could not find anything wrong with car—a blatant lie.

Pavel argues that he made no misrepresentations because the timing chains are not faulty. He attempted to support this claim by asserting that he took the car

to a retired mechanic who replaced a gasket, and the car no longer had any issues. Even if Pavel did not notice any signs of mechanical issues while he drove the car leading up to the sale, Pavel misrepresented the dealership's diagnosis by telling Walton the dealership found nothing wrong with the car.

### b.  Concealment and Omission of Material Fact

Pavel also concealed and omitted material facts by failing to disclose the faulty timing chains and by providing a deceptively incomplete service record omitting the dealership's diagnosis and quote for the timing chains repair.

A fact is material if a "reasonable consumer would likely consider it to be important in making a purchasing decision." Mo. Code Regs. Ann. tit. 15, § 60-9.010(1)(C); *see also Tucker v. Gen. Motors LLC*, 58 F.4th at 397 (applying definition). Concealment includes "any method, act, use or practice which operates to hide or keep material fact from consumers." Mo. Code Regs. Ann. tit. 15 § 60-9.110(1). An omission is any "failure by a person to disclose material facts known to him/her, or upon reasonable inquiry would be known to him/her." Mo. Code Regs. Ann. tit. 15 § 60-9.110(3); *see also Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 774 (Mo. 2007) (applying definition).

The faulty timing chains and the dealership's assessment of the vehicle were material facts because if Walton had been informed of the repairs the car needed, she may have declined to purchase it—particularly because the cost of the repairs, i.e., new timing chains or a complete engine replacement, would far exceed the car's purchase price.

Pavel failed to disclose the faulty timing chains to Walton. In their initial correspondence, Walton asked if the car had any issues. Pavel said it did not, and falsely claimed that the dealership could not find anything wrong with the car. There is no question Pavel knew about the faulty timing chains because the dealership provided him a quote, and he even considered getting the repairs until the dealership informed him that his extended service plan would not cover the costs. Pavel also concealed and kept Walton from being informed about the faulty timing chains by deliberately providing an incomplete service record excluding the BMW dealership's quote for timing chain repairs.

In sum, Walton has proven by a preponderance of the evidence that Pavel made misrepresentations regarding the car's condition. She also demonstrated that Pavel concealed and omitted materials facts. Thus, Walton has shown that Pavel engaged in acts declared unlawful under § 407.020.

### 4. Ascertainable Loss of Money or Property

As a result of Pavel's unlawful acts under the MMPA, Walton suffered an ascertainable loss of money.

To determine whether the plaintiff has suffered an ascertainable loss of money, courts apply the "benefit of the bargain" rule. *Vitello v. Natrol, LLC*, 50 F.4th 689, 693 (8th Cir. 2022) (citing *Sunset Pools of St. Louis, Inc. v. Schaefer*, 869 S.W.2d 883, 886 (Mo. Ct. App. 1994)). To determine the plaintiff's loss, the court compares the value of the product as represented by the defendant and the actual value the plaintiff received. *Id.*

10

The court will discuss the value of the appropriate remedy in greater detail in its damages section, but for now, the court concludes that Walton suffered an ascertainable loss as a result of Pavel's misrepresentation. Pavel marketed the car to Walton as a functioning vehicle needing no repairs, and Walton purchased the car for her daily transportation. But because the car needs a total engine replacement and could otherwise break down at any time, Walton is unable to use the car as she intended. Moreover, Walton purchased the car for $12,000 and it needed approximately $20,000 in repairs. Thus, clearly Walton suffered an ascertainable loss by purchasing the vehicle for more than its actual value, and Pavel's misrepresentations induced her to make the purchase.

**B. Section 407.025.1(2) Elements**

Walton has established the four elements of an MMPA claim under § 407.025.1(1), but she also must prove three additional elements under § 407.025.1(2). *Abbott v. Golden Grain Co.*, 677 F. Supp. 3d 940, 947 (E.D. Mo. 2023) (determining that 2020 amendments add three additional elements to the original four).

Under § 407.025.(2) the plaintiff must demonstrate (1) that she "acted as a reasonable consumer would in light of all circumstances;" (2) that the defendant's alleged violation of the MMPA would "cause a reasonable person to enter into the transaction that resulted in damages[;]" and (3) that the plaintiff incurred "individual damages with sufficiently definitive and objective evidence to allow the loss to be

calculated with a reasonable degree of certainty." *Id.* (quoting Mo. Rev. Stat. § 407.025.1(2)).[28]

### 1. Reasonable Consumer

Walton has established that she acted as a reasonable consumer in relying on Pavel's representations.

To determine whether the plaintiff acted as a reasonable consumer, the court analyzes the totality of the circumstances surrounding the transaction. Mo. Rev. Stat. § 401.025.1(2)(a) (requiring the court to determine whether the plaintiff acted reasonably in "light of all circumstances").

Walton has shown that she acted as a reasonable consumer because Pavel's misrepresentations, misleading presentation of an incomplete service record, and all other circumstances surrounding the transaction created a false impression that the car was in good condition. Indeed, Pavel said many times that the car had no issues and presented a deceptively incomplete service record that appeared to confirm his misrepresentations.

Pavel appears to argue that Walton did not act as a reasonable consumer because should have gotten the car inspected, and he argues he is not responsible for anything that happened after Walton purchased the car. But Pavel's actions leading up to the sale undermine his own argument. Perhaps under different circumstances it would have been unreasonable for Walton to buy a car with an illuminated check engine light without getting an inspection, but Pavel reassured her that the car had

---

[28] The court notes that, at this time, there is limited caselaw discussing the 2020 amendments to the MMPA.

12

no issues and provided a deceptively incomplete service record that did not indicate the faulty timing chains. He also stated that he drove the car daily without problems. Moreover, Walton test drove the vehicle and experienced no issues while driving the car, and she explained that she had experienced vehicles in the past with illuminated check engine lights but no mechanical issues.

So instead of getting the car inspected, Walton reasonably relied on Pavel's statements regarding the car's condition and the deceptively incomplete service record that included a recent inspection by the dealership. Pavel's misrepresentations also make it reasonable for Walton to sign an "as-is warranty" because Pavel persuaded her that the car needed no repairs. Thus, the court concludes that Walton has proven that she acted as a reasonable consumer despite Pavel's arguments to the contrary.

## 2. Reasonable Person Would Have Entered Transaction

Similarly, Walton has shown a reasonable person would have purchased the car as a result of Pavel's violation of the MMPA.

The issues of whether the plaintiff acted as a reasonable consumer and whether a reasonable person would have entered the transaction present the court with similar questions. *Abbott v. Golden Grain Co.*, 677 F. Supp. 3d 940, 950 (E.D. Mo. 2023) (analyzing the reasonable consumer and reasonable person requirements together). Section 407.025.1(2)(b) specifically requires the court to focus on the defendant's unlawful acts and whether they would induce a reasonable person to enter the transaction at issue.

For the same reasons the court concluded Walton acted as a reasonable consumer in light of all circumstances, the court concludes that a reasonable person would have purchased the vehicle because of Pavel's misrepresentations and concealment or omissions of material fact. Pavel induced Walton to purchase the car through several misrepresentations and omissions of material facts regarding the car's condition. Moreover, Pavel provided a deceptively incomplete service record, which a reasonable person would have no reason to believe was incomplete. Ultimately, Walton learned of Pavel's dishonesty and deception, but the court notes that hindsight is 20/20 and concludes that a reasonable person would have acted as Walton did at the time she purchased the car.

### 3. Objective Damages

Walton has also proven that she incurred "individual damages with sufficiently definitive and objective evidence to allow the loss to be calculated with a reasonable degree of certainty." Mo. Rev. Stat. § 407.025.1(2).

The court will discuss damages in greater detail in its damages section, but the court notes that Walton presented definitive and objective evidence that she suffered concrete damages. Walton provided credible testimony and admitted exhibits demonstrating the amount Walton paid for the car as well as the cost of proceeding with timing chain repairs and engine replacement. Therefore, Walton presented "definitive" and "objective" evidence from which the court can determine the appropriate damages to award her.

Walton has established her MMPA claim by a preponderance of the evidence. Thus, the court turns to Walton's second count and must now determine whether Walton has established that her MMPA claim is nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code.

## II.    Nondischargeability under 11 U.S.C. § 523(a)(2)(A)

The Bankruptcy Code broadly permits the discharge of prepetition debts for the honest but unfortunate debtor, but § 523 of the Bankruptcy Code limits discharge in certain circumstances. *See Cohen v. de la Cruz*, 523 U.S. 213, 217–18 (1998) (discussing § 523(a)(2)(A) limiting discharge for debts obtained by fraud). Section 523(a)(2)(A) specifically provides that debts for money obtained by "false pretenses, a false representation, or actual fraud" cannot be discharged. 11 U.S.C. § 523(a)(2)(A).

As the plaintiff, Walton bears the burden of proving that her claim is nondischargeable by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 291 (1991) (holding that the preponderance of the evidence standard applies to all exceptions from dischargeability of debts contained under 11 U.S.C. § 523(a)).

To establish that a debt is nondischargeable under § 523(a)(2)(A) the plaintiff must show "[the] debtor (1) made a representation, (2) with knowledge of its falsity, (3) deliberately for the purpose of deceiving the creditor, (4) who justifiably relied on the representation, and which (5) proximately caused the creditor damage." *Excellent Home Props., Inc. v. Kinard (In re Kinard)*, 998 F.3d 352, 354–55 (8th Cir. 2021) (quoting *Hernandez v. Gen. Mills. Fed. Cred. Union (In re Hernandez)*, 860 F.3d 591, 602 (8th Cir. 2017)) (internal quotation marks omitted).

The court will next analyze each element of nondischargeability under § 523(a)(2)(A).

## A. False Representation

Pavel made several false representations regarding the condition of the car, and he omitted material facts.

A representation for the purposes of a § 523(a)(2)(A) analysis is quite broad. Indeed, the debtor's silence regarding a material fact or the debtor's silence when there is an affirmative duty to speak amounts to representation. *Ostertag v. Overall (In re Overall)*, 248 B.R. 146, 151 (Bankr. W.D. Mo. 2000); *see also Heide v. Juve (In re Juve)*, 761 F.3d 847, 851 (8th Cir. 2014) ("A debtor's silence as to a material fact can constitute a false representation under § 523(a)(2)(A).").

Here, Pavel made several representations regarding the condition of the car. Pavel told Walton that the car did not need "anything."[29] He also said that when he took the car back to the dealership after the dealership installed the new crankshaft position sensor, the dealer could not find anything wrong with the car despite the illuminated check engine light. Pavel further told her that the "[c]ar ha[d] no issues."[30] Pavel also provided a deceptively incomplete service record that excluded the dealership's assessment that the car needed new timing chains.

Pavel alleges that the timing chains were not faulty—meaning his representations regarding the car's condition were true. Pavel—relying on hearsay—further asserts that he took the car to a retired mechanic who claimed the only issue

---

[29] Alannah Walton's Exs. for Trial, ECF No. 22, Ex. 2, pg. 1 of 11.
[30] *Id.* at pg. 2 of 11.

with the car was the alleged improper installation of the crankshaft position sensor, and the retired mechanic repaired the car by replacing a gasket. It appears, based on his representations in court, that Pavel still believes that the car's timing chains are not faulty.

Although the court declines the opportunity to delve into the nuts and bolts of BMW repairs, the court notes that both the BMW dealership and the specialist Walton took the car to after she purchased it reached the same conclusion—the car's timing chains were faulty and needed replacement. It seems unlikely that both mechanics incorrectly identified the same problem. Regardless, Pavel made false representations even if the timing chains are not faulty. Specifically, the court reiterates and emphasizes that Pavel blatantly lied to Walton when he told her the dealership could not find anything wrong with the car. Even if he believed the dealership incorrectly identified the faulty timing chains, Pavel clearly misrepresented the dealership's diagnosis when he told Walton that the dealership founding nothing wrong with the car.

Moreover, Pavel omitted a material fact by failing to provide a complete service record after Walton asked him to provide "any service records"[31] on the car as a condition of the purchase. Instead, he only provided the service record from the crankshaft position sensor installation which did not include any indication of the faulty timing chains. This omission was material because it excluded the most recent service record on the car that would have let Walton know about the faulty timing

---

[31] Alannah Walton's Exs. for Trial, ECF No. 22, Ex. 2, pg. 8 of 11.

chains—an expensive repair that would cost more than the price of the car and would certainly affect whether Walton would be willing to purchase the car.

## B. Knowledge of Falsity

Pavel clearly knew his representations were false because he misrepresented to Walton what the mechanics at the BMW dealership told him.

In determining whether the debtor knew his representations were false, the court must look to the "knowledge and experience" of the debtor. *Merchs. Nat'l Bank of Winona v. Moen (In re Moen)*, 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999) (internal quotation marks omitted). Even if the debtor did not clearly know his statements were false, if the plaintiff is able to show that the debtor made false representations with "reckless disregard for the truth," i.e., the plaintiff shows that the debtor should have known his representations were false, then the plaintiff has satisfied the knowledge element under § 523(a)(2)(A). *Id.*

As discussed, Pavel disagrees with the faulty timing chains diagnosis. He argues that he did not know he was making false statements or omitting material facts because he did not believe the timing chains were in fact faulty. He further states he believed the car had no defects because he drove it daily without any problems after the retired mechanic replaced a gasket.

There are two reasons this is implausible. One, after getting the crankshaft position sensor installed, Pavel admits that the car was still "running rough," so he returned the car to the dealership for additional repairs. Second, Pavel even considered having the timing chains repaired, believing his extended service plan

would cover the cost of the repairs. Pavel, however, asserts that the dealership refused to process his claim with the service plan provider, so he declined the repairs. Both facts indicate that Pavel—not long before selling the car to Walton—was aware of and tried to resolve the car's faulty timing chains.

Pavel, however, alleges that after the retired mechanic replaced a gasket, the car had no more issues, so he did not believe he needed to mention the potential defect to Walton. Though this explanation may make his story more plausible, it nevertheless fails to explain his affirmatively false statement regarding the dealership's diagnosis. He, of course, knew the mechanic at the dealership believed the car needed new timing chains, and he admits that he asked the dealership to replace the timing chains before he discovered that his extended service plan would not cover the repairs. Pavel, however, not only told Walton there was nothing wrong with the car, but he went on to say *that the dealership could not find anything wrong with the car*—a patently false statement contradicting what he admits the mechanic at the dealership told him. Because Pavel was aware of the circumstances contradicting his statements, he must have known he was not telling the truth when he told Walton that the dealership could not find anything wrong with the car.

## C. Deliberately for the Purpose of Deceiving the Creditor

Pavel made false representations and omissions for the purpose of deceiving Walton.

To prove an intent to deceive, the plaintiff does not need to prove that the debtor acted with malevolence. *In re Moen*, 238 B.R. at 791. Instead, § 523(a)(2)(A)

only requires the plaintiff to prove that the debtor "intend[ed] to induce the [plaintiff] to rely and act on the misrepresentations in question." *Id.* (internal quotation marks omitted). Because direct evidence of intent is difficult to obtain, the court may infer the debtor's intent to deceive from evidence of the surrounding circumstances. *Caspers v. Van Horne (Matter of Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987). If the debtor knew or should have known that his false representations would induce the plaintiff to act, then the court will infer an intent to deceive. *In re Moen*, 238 B.R. at 791.

Pavel argues he did not believe that the car's timing chains were faulty. Therefore, he argues that he lacked the intent to deceive Walton. But as the court has discussed several times, Pavel not only told Walton that the car had no issues; he also told Walton that the dealership could not find anything wrong with the car. Even if Pavel truly thought the car had no issues, which is unlikely under the circumstances, there is only one reason why Pavel would lie about what the BMW dealership told him—he intended to deceive Walton.

Pavel could have told Walton that the dealership identified the faulty timing chains but that he took the car to a retired mechanic who identified a different issue and fixed it by replacing a gasket. Instead, Pavel not only provided incomplete information, but he also falsely stated that the dealership found no issues with the car.

Pavel either knew or should have known that whether Walton knew about the faulty timing chains would affect her decision to purchase the car because the faulty

timing chains would require replacement of the timing chains or the entire engine—repairs that cost more than the value of the car and more than the $13,000 he originally asked for the car. Pavel knew about the cost of the repair because the dealership provided him a quote. If he had told Walton about the dealership's diagnosis, she would have known of the risk that she might need to repair the car at a high cost. This risk would have undoubtedly affected whether Walton would have purchased the car.

Pavel says he did not intend to deceive Walton, highlighting that he gave her the opportunity to get the car inspected.[32] Walton says she did not have the chance to get an inspection.[33] But even if Pavel provided Walton the opportunity to get a prepurchase inspection, it would not negate his fraudulent intent. Pavel made numerous false representations and provided a deceptively incomplete service record. Thus, as Pavel intended, Walton was misled to believe she did not need to get the car inspected.

Based on this evidence, the court can infer that Pavel intended to deceive Walton through multiple misrepresentations, and he deliberately concealed the car's potential mechanical issues by intentionally omitting material facts.

---

[32] April 18 Trial Tr. 36:13–24.
[33] *Id.* at 25:13–24.

### D. Justifiable Reliance

Walton justifiably relied on Pavel's representations that the car had no issues and that the dealership could not find anything wrong with the car.

The Supreme Court adopted the common law definition of justifiable reliance, under which a plaintiff "is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Field v. Mans*, 516 U.S. 59, 70 (1995) (quoting Restatement (Second) of Torts (1976) at § 537). The court must look to the "qualities and characteristics of the plaintiff" to determine whether the plaintiff justifiably relied on the debtor's false representation. *Id.* at 71 (internal quotation marks omitted). A plaintiff cannot justifiably rely on a false representation if the truth is readily apparent or after the plaintiff discovers a warning sign that she is being deceived. *Hernandez v. Gen. Mills Fed. Cred. Union (In re Hernandez)*, 860 F.3d 591, 604 (8th Cir. 2017) (citing *Fields v. Mans*, 516 U.S. at 71).

Pavel argues that Walton's reliance is unjustified because she could have gotten the car inspected but declined. But Pavel made numerous representations convincing Walton that there was nothing wrong with the car. He said more than once that the car had nothing wrong with it. He stated that he drove the car daily with no problems. He also falsely stated that the dealership could find nothing wrong with the car.

The court finds that Walton justifiably relied on Pavel's representations because Pavel, through his omissions and misrepresentations, persuaded her that

she did not need to get the car inspected. Further, Walton test drove the car without experiencing any problems, and Pavel assured Walton that the check engine light remained illuminated because of a faulty sensor. Moreover, Pavel provided a deceptively incomplete service record that included the recent installation of the crankshaft position sensor but excluded the dealership diagnosis of faulty timing chains. Walton also testified that she had previous experience with vehicles having illuminated check engine lights even though the cars had no actual engine problems.[34] Thus, Walton justifiably relied on incomplete and misleading information from Pavel. She saw no warning signs of the faulty timing chains, and she certainly could not have predicted that the car needed approximately $20,000 in repairs. For these reasons, the court finds that Walton justifiably relied on Pavel's misrepresentations.

### E. Proximate Cause

Pavel's false representations proximately caused Walton's injuries because Pavel induced Walton to spend $12,000 for a car that needed approximately $20,000 of repairs.

Proximate cause is an issue of foreseeability. The court must determine whether the debtor's false representation led to the plaintiff's foreseeable injury. *See Wieberg v. Thompson (In re Thompson)*, 316 B.R. 326, 328 (Bankr. W.D. Mo. 2004) (discussing proximate cause under § 523(a)(6)).

---

[34] *Id.* at 6:11–21.

Here, the issue of proximate cause is relatively straightforward. As discussed, Pavel made numerous representations for the purpose of inducing Walton to purchase the car, and unfortunately, she did purchase the car. As a result, she paid Pavel $12,000 for a car that needed approximately $20,000 in repairs. Pavel's false and misleading statements regarding the car's condition clearly persuaded Walton that the car was worth purchasing and led to the foreseeable outcome of Walton purchasing a car worth substantially less than what she paid.

Thus, Walton has proven her MMPA claim against Pavel and proven by a preponderance of the evidence that her MMPA claim is nondischargeable. But the court must still calculate Walton's MMPA damages.

## III.   Remedy

Walton requests $12,000 in damages plus $500 in interest. She also requests Pavel pay her attorney's fees and expenses which total $12,146.81.[35] For the reasons the court will discuss, the court awards Walton the total amount she requests: $24,646.81.[36]

### A. Benefit of the Bargain

---

[35] Alannah Walton's Exs. for Trial, ECF No. 22, Ex. 9.

[36] Walton invoked Rule 7015 of the Federal Rules of Bankruptcy Procedure to amend her pleadings to conform to the evidence presented at trial. Walton did this to include a request for recission of the sale which she included in her state court petition but not her complaint in this adversary proceeding. April 18 Trial Tr. 33:1–9. It is within the discretion of the court to enlarge pleadings, sua sponte. *See Ehrichs v. Kearney*, 730 F.2d 1170, 1174 (8th Cir. 1984) ("... a court may grant recovery on a theory not pled but fairly tried by both parties."). Upon Walton's request and no objection by Pavel, the court granted the request to amend the pleadings to conform to the evidence adduced at trial. April 18 Trial Tr. 33:13–14. Nevertheless, at the end of the trial she requested that the court enter a money judgment instead of recission. *Id.* at 34:12–15. Thus, the court will proceed with a damages analysis in lieu of recission.

First, the court must determine the value of the actual damages Walton suffered as a result of Pavel's MMPA violation.

Courts apply the "benefit of the bargain rule" to determine damages under the MMPA. *Abbott v. Golden Grain Co.*, 677 F. Supp 3d 940, 948 (E.D. Mo. 2023). The benefit of the bargain is calculated by determining the "difference between the actual value of the property at the time of the sale and what its value would have been if the [false] representation had been true." *Id.* (internal quotation marks omitted).

Here, Walton believed she paid $12,000 for a car with no mechanical issues that she could safely drive. Thus, the court can infer that the car would have been worth approximately $12,000 if Pavel's representations regarding the car's condition were true. But the car actually needed approximately $20,000 in repairs and could not be safely driven due to the risk of the engine spontaneously breaking down. The cost of repairs exceeds the value of the car—making the car worth essentially nothing. Therefore, the court concludes that Walton suffered $12,000—the difference between the purchase price and the car's actual value—in actual damages.

Walton also paid $500 in interest on the loan she took out to purchase the car. Walton would not have taken the loan out had she not been convinced to purchase the car, and Pavel knew she was financing her purchase with a loan. Thus, she is entitled to an additional $500 in actual damages.

## B. Attorney's Fees

Turning to Walton's request for attorney's fees, the court concludes that Walton is entitled to all attorney's fees and expenses she requests.

A plaintiff ordinarily bears the expense of her own attorney's fees, but the MMPA authorizes the court, at its discretion, to award attorney's fees to the prevailing party. Mo. Rev. Stat. § 407.025.2(2); *see Arcese v. Daniel Schmitt & Co.,* 504 S.W.3d 772, 787–88 (Mo. Ct. App. 2016). Indeed, awarding attorney's fees to successful plaintiffs is the rule rather than the exception when a plaintiff succeeds on her claim under the MMPA, *see Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1028 (8th Cir. 2000), because awarding attorney's fees not only remedies violations of the MMPA, it also prospectively deters future MMPA violations and thereby protects Missouri citizens. *Berry v. Volkswagen Grp. of Am., Inc.*, 397 S.W.3d 425, 433 (Mo. 2013).

The court determines that awarding Walton her attorney's fees in this case is appropriate. Pavel's deliberate misrepresentations and omissions of material fact are clear MMPA violations. Because the court does not identify any mediating factors warranting the embrace of any exception, the court follows the general rule and awards attorney's fees to Walton as a successful MMPA plaintiff.

But the court must also determine whether Walton's attorney's fees and expenses of $12,146.81 are reasonable. Section 407.025.2(2) provides that a plaintiff may recover attorney fees from the defendant for "the amount of time reasonably expended." There are several factors Missouri courts have identified when determining the reasonableness of attorney's fees:

> (1) the rates customarily charged by the representing attorneys and local attorneys who handle similar work; (2) the number of hours reasonably spent on the litigation; (3) the nature of the services provided; (4) the degree of necessary professional expertise; (5) the

26

nature and importance of the subject matter; (6) the amount involved or the result obtained; and (7) the vigor of the opposition.

*Ostermeier v. Prime Props. Invs. Inc.*, 589 S.W.3d 1, 6 (Mo. Ct. App. 2019) (internal quotation marks omitted).

The court will first address factors one through three.

Here, Walton's counsel incurred $12,146.81 in attorney's fees and costs. Walton's counsel and their staff spent a cumulative 47.20 hours working on the state court lawsuit and this adversary proceeding. The hourly rate varied from $15 dollars an hour for an investigator;[37] $150–155 for paralegals;[38] $225 for associates;[39] and up to $300 an hour for partners[40] totaling $11,379.50.[41] Counsel also incurred $767.31 in expenses from items such as filing fees, postage, photocopying, and mileage.[42] The court determines that these hourly rates are reasonable and consistent with local market hourly rates for bankruptcy attorneys, litigators, and their staff.

Further, the court has reviewed all of Walton's counsel's time records and expense reports and concludes that all fees are reasonable and appropriate. Walton's counsel had to first prepare a state court petition, which required review of the documents Walton presented her counsel in support of her case and research of the MMPA. Then Walton's counsel discussed settling the state court case with Pavel's former counsel. After Pavel's counsel withdrew and Pavel filed bankruptcy, Walton's

---

[37] The court notes that 3.3 hours worked were billed at $0. Alannah Walton's Exs. for Trial, ECF No. 22, Ex. 9, pg. 4 of 5.
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.* at pg. 5 of 5.

counsel prepared an adversary proceeding complaint adding a count seeking a determination that Walton's claim is nondischargeable. Counsel prepared and conducted depositions of Pavel and Jacob Fulder (the lead technician at the BMW dealership). Counsel also drafted subpoenas, discovery requests, and requests for admissions. Counsel attended multiple pretrial status conferences and prepared for an in-person trial in Springfield, Missouri.

Turning to factors four through seven, the court determines that handling Walton's case required professional expertise in bankruptcy and state court litigation. Additionally, Walton pursuing this case could be the only way for her to recover anything from Pavel for his MMPA violations, so clearly this case represents an important subject matter to Walton. Moreover, Walton, with the help of her counsel, succeeds on her MMPA claim, and as a result, will receive a substantial judgment in her favor. Lastly, Pavel has vigorously defended himself in this adversary proceeding, and the parties tried both of Walton's causes of action.

In sum, each time entry clearly explains the work counsel and their staff performed. Despite all the work the state court action and this adversary proceeding required, counsel and their staff spent a modest 47.20 total hours. Counsel also minimized time spent billing at higher rates by delegating work to staff members and associates who charge lower hourly rates. Moreover, the court concludes that the $767.31 in expenses is reasonable because most of those expenses represent the state and federal court filing fees as well as payment for deposition reporting services, which were necessary costs of litigation.

## CONCLUSION

For the reasons explained above, the court determines that Walton has met her burden of establishing by a preponderance of the evidence that Pavel violated the Missouri Merchandising Practices Act. Walton has also established by a preponderance of the evidence that her claim is nondischargeable under 11 U.S.C. § 523(a)(2)(A). Therefore, the court finds Pavel liable for $12,000 in damages; $500 in interest; and $12,146.81 in attorney fees and expenses. The court holds that the entirety of Walton's claim against Pavel is nondischargeable.

The clerk of the court is directed to enter a separate judgment consistent with this memorandum opinion and order.

IT IS SO ORDERED.

Dated: 7/10/2024            /s/ Brian T. Fenimore
                           United States Bankruptcy Judge